FEDERATED MUTUAL IMPLEMENT
AND HARDWARE INSURANCE COM-
PANY, a Corporation, Plaintiff,

v.

M. F. A. MUTUAL INSURANCE COM-
PANY, a Corporation, et al.,
Defendants.

No. 13096-3.

United States District Court
W. D. Missouri,
St. Joseph Division.

Aug. 8, 1962.

Kuraner, Freeman, Kuraner, Ober-
lander & Lamkin, Kansas City, Mo., for
plaintiff.

Strop, Watkins, Maughmer & Roberts,
St. Joseph, Mo., for defendant M. F. A.
Mutual Ins.

Gene Thompson, Maryville, Mo., for
defendants Doyle, Janice Lee and Chris-
tie Davis.

248

Max Benne, Mound City, Mo., for Ernest A. and Diane Wright.

Hull & Strong, Maryville, Mo., for defendant H. H. Gard.

DUNCAN, District Judge.

Plaintiff, an Illinois corporation, instituted this declaratory judgment action under § 2201 et seq., Title 28 U.S.C.A. wherein plaintiff, and defendant M. F. A. Mutual Insurance Company, dispute liability coverage for damages claimed to have arisen out of an automobile accident. The jurisdictional prerequisites are present.

The material facts are not in dispute, and the case is before the court on stipulation and evidence introduced by the respective parties.

The defendants, Donald E. Hall and his wife, Mattie L. Hall, were, prior to July 30, 1958, engaged in business in Mound City, Missouri, and as a part of that business, they were franchise holders and sales agents for Pontiac automobiles and John Deere farm implements.

On December 29, 1959, the plaintiff issued to the defendants, Donald E. Hall and Mattie L. Hall, its garage liability policy No. 698 652, insuring said defendants for a period of one year, against liability for bodily injury to others, in the amount of $100,000.00 for each person, and in the amount of $300,-000.00 for each accident.

The policy also provided against liability for property damage in the amount of $10,000.00 for each accident arising out of the operation by the said defendants of an automobile sales and service business.

Prior to July 30, 1958, the defendant Ernest A. Wright had been in the employ of the defendants Hall as manager of their parts department, and for his services he received a fixed salary. His duties in that connection were to buy and sell at retail, parts and supplies for the automobiles and equipment sold and serviced by the defendants Hall.

Prior to that time it had been the custom and practice of defendants Hall to permit their salesmen to purchase automobiles to be used as demonstrators and to pay therefor the wholesale price plus accrued interest charges and shop expense incident to the preparation of a car for delivery. The evidence reveals that Wright, as the manager of their parts department, was accorded the same privileges granted to salesmen in the purchase of an automobile.

Pursuant to their arrangement, on July 30, 1958, Wright purchased a '58 Pontiac automobile for the sum of $2638.57 and paid cash therefor. At the time the sale was made, there was an entry made on a slip to be recorded in the books and records of the company, which recited: "Paid on a/c $2638.-57". This amount was placed to Wright's credit on the books.

No certificate or bill of sale was issued to Wright. He immediately took possession of the car and used Halls' dealer license plates. The car, according to all the evidence, was purchased for use as Wright's personal car and that of his family.

Immediately after the car was delivered to Wright, he caused to be transferred from another car owned by him, a policy of liability insurance written by the defendant Insurance Company.

On June 11, 1960, while the car was being operated by Wright's wife, it came into collision with another automobile. The accident resulted in the death of Mrs. Wright and the operator of the other car, and one of the passengers therein. Numerous other persons who were named as defendants in this Complaint were injured.

The claims of the various parties growing out of the collision have been settled in accordance with a stipulation which provided that after completion of the settlement of the claims filed as a result of the accident, the complaint will be dismissed without prejudice as to all defendants except M. F. A. Mutual Insurance Company, leaving the Federated

Mutual Implement and Hardware Insurance Company as plaintiff. The stipulation provides that the ultimate responsibility as liability insurer on the Pontiac automobile "only will be determined by the declaratory judgment of this court."

The defendant Insurance Company contends that the defendants Hall were the owners of the automobile at the time of the collision and that plaintiff is liable under the terms of its garage liability policy for the damages and injuries resulting from the use thereof by Mrs. Wright. Plaintiff contends that Wright was the owner at the time of the collision and that the defendant Insurance Company is liable under the terms of its policy.

This case revolves around the principal question of whether or not there was a sale of the automobile within the meaning of § 301.200, RSMo 1949, V.A.M.S. To resolve that question we must look to the law dealing with the sale and registration of motor vehicles in Missouri, as contained in Chapter 301, V.A.M.S. The first section of that Chapter dealing with the subject is § 301.020 which provides:

"Every owner of a motor vehicle or trailer, which shall be operated or driven upon the highways of this state, except as herein otherwise expressly provided, shall file, by mail or otherwise, in the office of the director of revenue, an application for registration on a blank to be furnished by the director of revenue for that purpose, containing:

"(1) A brief description of the motor vehicle to be registered, including the name of the manufacturer, the manufacturer's or other identifying number, and character, and amount of motive power, stated in figures of horse power;

"(2) The name, residence and business address of the owner of such motor vehicle; * * *."

The next section which is pertinent is 301.190. This section provides that:

"No certificate of registration of any motor vehicle or trailer, or number plate therefor, shall be issued by the director of revenue unless the applicant therefor shall make application for and be granted a certificate of ownership of such motor vehicle or trailer, or shall present satisfactory evidence that such certificate has been previously issued to the applicant for such motor vehicle or trailer.

"Application shall be made upon a blank form furnished by the director of revenue and shall contain a full description of the motor vehicle or trailer, manufacturer's or other identifying number, together with a statement of the applicant's source of title and of any liens or encumbrances on the motor vehicle or trailer."

There are two sections dealing with the sale of motor vehicles in Missouri. The first section, 301.200, defines the procedure in connection with the sale of new motor vehicles by dealers, as follows:

"1. In the case of dealers, a separate certificate of ownership, either of such dealer's immediate vendor, or of the dealer himself, shall be required in the case of each motor vehicle in his possession, and the director of revenue shall determine the form in which application for such certificates of ownership and assignments shall be made, in case forms differing from those used for individuals are, in his judgment, reasonably required; provided, however, that no such certificates shall be required in the case of new motor vehicles or trailers sold by manufacturers to dealers.

"2. Dealers shall execute and deliver bills of sale in accordance with forms prescribed by the director of revenue for all new cars sold by

them. On the presentation of a bill of sale, executed in the form prescribed by the director of revenue, by a manufacturer or a dealer for a new car sold in this state, a certificate of ownership shall be issued."

Section 301.210 deals with the transfer of used cars. The last section of that statute provides that:

" * * * the sale of any motor vehicle or trailer registered under the laws of this state, without the assignment of such certificate of ownership, shall be fraudulent and void."

It should be noted that this section deals with the sale of motor vehicles for which certificates of ownership have been issued—used cars. This section is important to show legislative intent.

■ While I have not reviewed the legislative history of the enactment of this section, certainly it is easy to assume what was in the minds of the framers of the Act. The transfer of ownership of used motor vehicles was susceptible of unlimited fraud and deception by unscrupulous dealers or owners of fraudulent titles, and it was necessary to require strict conformance to the statute requirements to avoid this possibility.

■ That, however, may not be said of the sale and transfer of ownership of new motor vehicles which have never been titled. Paragraph 2 of § 301.200 states that "dealers shall execute and deliver bills of sale in accordance with forms prescribed by the director of revenue for all new cars sold by them." However, there is no provision avoiding the sale that is not in strict accordance with the statute. The provision making such sale "fraudulent and void" is conspicuously absent.

In view of the chapter relating to the sale and titling of motor vehicles generally, I think this provision of the statute was made for the convenience and benefit of the Commissioner in determining his responsibilities in the issuance of certificates of title to the purchasers of new automobiles, because he is required, under the statute, to be possessed of certain information and knowledge before he is authorized to issue a certificate of title.

■ The failure on the part of a seller of an automobile to give the purchaser a bill of sale in strict accordance with the forms prescribed by the director of revenue, would not of itself, avoid the sale as between the vendor and the vendee.

In this connection, it was held in Stephen Burns, Inc. v. Trantham, Mo. App., 305 S.W.2d 66 that the question was whether title passed when no certificate of title was issued by the seller and the proper bill of sale form was not used. The purchaser signed a filled-in printed form captioned, "Retail Buyer's Order" which stated that he agreed to purchase for cash a Mercury car of a certain motor number and the bottom of the form was initialed by an authorized salesman for the plaintiff next to the printed word "accepted". The court, in ruling that the "Retail Buyer's Order" was all that was needed to pass title, stated:

"There is no dispute about possession and the only remaining question is whether or not the paper captioned 'Retail Buyer's Order' could be construed to be a bill of sale."

No authority has been cited and I have not been able to find any holding that a bill of sale not in strict accordance with the form prescribed by the director of revenue renders void as between the original parties the sale of a new motor vehicle.

The only statutory law pertaining to the sale of new automobiles by a dealer is found in § 301.200. In Mallory Motor Company v. Overall, Mo.App., 279 S.W.2d 532, dealing with the sale of a new motor vehicle, the court said: (l. c. 535)

"It should be pointed out that the situation appearing in the case at

bar is entirely different from those shown in the many cases construing what is now Section 301.210 RSMo 1949, V.A.M.S. That section says that the sale of any motor vehicle which has been *registered*, 'without the assignment of such certificate of ownership, shall be fraudulent and void.' " [Citing Vetter v. Browne, 231 Mo.App. 1147, 85 S.W. 2d 197].

Defendant here seriously contends that there was really no legal sale or passing of any title, and that to all intents and purposes, the car remained the property of the vendors. Defendant's contention does not conform to the facts as shown by the evidence.

The evidence is undisputed that Wright used the car as his own. The testimony revealed that the understanding between Hall and Wright was that the car was being purchased for family use. Although Wright drove the car to the place of business occasionally, there is no dispute that the motor vehicle in question remained at the Wright home the larger part of the time.

Further, Wright had the privilege of selling the car at any time and retaining any sum of money received in excess of the original sale price. Wright testified on cross examination that neither the salesmen nor the "boss" could sell the car without his approval.

The contention that the car was used as a demonstrator is also not substantiated by the evidence. There was no testimony that the car was ever used as a demonstrator, although Wright contended that he did show the automobile in question for the purpose of selling another vehicle.

█ However, the fact that this car was used for almost two years defeats the contention that it was a demonstrator. It is a matter of common knowledge that demonstrators are not used for an extended period of time by salesmen, as this type of car has a rapid turn-over. The very nature of the busi-

ness would seem to indicate the necessity for this practice. These facts show that the car did not remain the property of the vendor.

█ It is further my conclusion that under the facts in the case there was a document which was sufficient under the statute to convey title if a bill of sale was required.

On July 30, 1958, Wright paid to the Halls, the sum of $2638.57, and this amount was credited to the account of Wright by the bookkeeper, and there was a memorandum which could be described as a receipt, made at that time which recited, "Paid on a/c $2638.57" and initialed by "J. H."

On November 14, 1958, a charge was made against the account of Wright on the books of the company in the sum of $2638.57, which was simply a compensating charge on the books of the company. Hall explained this by saying that the amount credited on July 30, 1958, had not been offset by the amount of the sale price of the car.

When this change was made on November 14, 1958, on the books of the company, an invoice was prepared which recited the date, the initial of the salesman, "J. H.", the name of the purchaser, his address and one new 1958 Pontiac automobile Chieftain 4 door sedan, the amount $2638.57 and the word "Collect" written in the center of the document, followed by the words: "(Acknowledgement of purchase on ticket #06401 made July 30—to correct inventory and credit balance). The word "net" also appears on the bottom of the invoice.

Wright's ledger sheet showed a credit beginning July 30, 1958, of $2638.57. On September 13, 1958, a credit of $8.23 was made to him, reducing his balance to $2630.34. This balance continued until November 14, when he was again charged with $2638.57.

The question is, were these memorandums sufficient as a bill of sale, assuming one was required? Undoubtedly the July 30 receipt could not under any circumstances have been considered as a

bill of sale. However, the invoice dated November 14, does comply with the requirements of the law for a bill of sale.

The only thing that is lacking is the serial number or a more definite description of the automobile. It does give the name of the purchaser, his address, describes the motor vehicle as a 1958 Pontiac Chieftain 4 door sedan, and the purchase price.

The defendant contends that this document was never delivered to the purchaser and the evidence does not reveal that it was, although the purchaser admitted that he knew it was in existence and was available to him. At any rate, he had already been in possession of the automobile for a period of approximately four months.

It would therefore be my conclusion that even assuming that the title may not have passed on June 30, that the document of November 14 was sufficient under the statute to convey title, if a bill of sale was required. However, insofar as the transfer of title as between the vendor and vendee in this case is concerned, I think it was not necessary that a bill of sale have been made.

"Except as otherwise prescribed by statute, it is not essential that the writing should be in any particular form as long as it shows an intent to transfer the property for a consideration. The writing may be in the form of a receipt acknowledging payment of the consideration for the property therein described; but it must show a present transfer, although it is not essential that it should recite the fact of delivery of the property. The instrument should so describe the property as to furnish the means of identifying it with reasonable certainty." 77 C.J.S. Sales § 125, p. 836.

Unless the statute requires it, and it is my conclusion that it does not, a bill of sale was not necessary to pass title from the vendor to the vendee.

"It was early held in this State that: 'As a matter of law a bill of sale is not necessary to pass the title to personal property. A delivery of the possession of goods under a contract to purchase passes the title, and from that time they belong to the vendee and are his risk.' [Citing numerous cases.]

"Under the common law, no *present* delivery was essential to the passing of title in the sale of a chattel. Wheless v. Meyer-Schmidt Grocer Co., 140 Mo.App. 572, 120 S.W. 708." Mallory Motor Company v. Overall, 279 S.W.2d 532.

The parties connected with this transaction flagrantly violated the law. Both Hall and Wright admitted that the reason for handling the transaction as it was, was to avoid the payment of the state sales tax. There was no certificate of ownership issued for the car as required by Section 301.190.

The code was violated by the use by Wright of the dealer's tags subsequent to fifteen days after the sale and the continued use of the motor vehicle without titling, as required by § 301.-140. Those facts do not affect the passage of the title or the ownership of the car itself. Therefore, regardless of any question of a certificate of title issued by the State, the automobile in question was not a motor vehicle covered by the policy of garage insurance issued by the plaintiff to the defendants Hall.

Defendant's Motion for Summary Judgment was continued until the trial of the case. That motion, and defendant's Motion for a Directed Verdict at the close of all the evidence is by the court overruled, and plaintiff's prayer for Declaratory Judgment is hereby sustained.